IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

EUNICE JONES, et al.          :

                              :

       v.                    :   Civil Action No. DKC 13-3238

                              :

POHANKA AUTO NORTH, INC.        :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this putative class action is the motion to dismiss filed by the remaining eleven Defendants: Pohanka Auto North, Inc.; Pohanka Chevrolet, Inc.; Pohanka Hyundai, Inc.; Pohanka Imports, Inc.; Pohanka MB, Inc.; Pohanka NMH, Inc.; Pohanka of Clarksville, Inc.; Pohanka of Salisbury, Inc.; Pohanka Oldsmobile-GMC Truck, Inc.; Pohanka SHO, Inc.; and Pohanka TM, Inc.  (ECF No. 17).  The issues have been fully briefed, and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, the motion to dismiss will be granted.

I. **Background**

A. **Factual Background**

On August 15, 2008, proposed Named Plaintiffs Eunice and Barbara Jones ("Plaintiffs") purchased from Pohanka Isuzu a used 2007 Mercedes-Benz C230 for $35,153.20, with financing they obtained by executing a Retail Installment Sale Contract ("RISC" or "credit contract").  (ECF No. 1-2).  Defendants represent –

and Plaintiffs do not challenge - that Pohanka Isuzu is now closed and that it was operated by Defendant Pohanka Auto North, Inc. ("Pohanka Auto North").  (ECF No. 17-1, at 9).  The RISC lists Eunice and Barbara Jones as the Buyers and Pohanka Isuzu as the "Creditor-Seller."  (*Id.* at 1).  The total price of the vehicle included a $750 charge for an optional debt cancellation agreement, which Plaintiffs purchased.  (*Id.* at 1; *see also* ECF No. 1-3).[1]  The "Applicable Law" section of the contract stated:

> Federal law and Maryland law apply to this contract.  This contract shall be subject to the Credit Grantor Closed End Credit Provisions (Subtitle 10) of Title 12 of the Commercial Law Article of the Maryland Code.

(ECF No. 1-2, at 4).  The contract also contained a "Holder Notice" that stated:

> Any holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto or with the proceeds hereof. Recovery hereunder by the debtor shall not exceed amounts paid by the debtor hereunder.

(*Id.*) (emphasis removed).  Plaintiffs' credit contract, including the GAP Agreement, was assigned to SunTrust, which is identified as the "lienholder" in the GAP Agreement.  (ECF No. 1-3, at 1).

---

[1]  The debt cancellation agreement is also called a Guaranteed Asset Protection Deficiency Waiver Addendum ("the GAP Agreement").

Plaintiffs contend that the debt cancellation agreement that they entered into is not a "true" debt cancellation agreement under Maryland Credit Grantor Closed End Credit Provisions ("CLEC"), Md. Code Ann., Com. Law § 12-1001 *et seq.* Under CLEC, a debt cancellation agreement requires a lender to cancel the remaining loan balance when a car is totaled and the insurance payout does not cover the entire outstanding balance. The debt cancellation agreement that was part of Plaintiffs' contract differed from the statutory definition of "debt cancellation agreement" under CLEC. Plaintiffs' debt cancellation agreement – which they believe was "phony" – stated:

> If the Insurance Company providing physical damage coverage on the Vehicle described above determines that Vehicle is a Total Loss, then You will be responsible for paying only the following to the Lienholder you make payments to under the Contract:
>
> 1. A) The Value of the Vehicle as determined by the physical damage insurance company on the Date of Loss or the Nada Retail Value of the Vehicle, whichever is greater, plus any physical damage insurance deductible over $1,000 which reduces that settlement, or
>
> B) If there is no physical damage insurance in effect on the Date of Loss, the average retail price of the Vehicle on the Date of Loss based on a current edition of the NADA Used Vehicle Price Guide.

(ECF No. 1-3, at 1). According to the complaint, "[t]he phony GAP Agreements purchased by Plaintiffs and the Class, [] only

agree to relieve the borrower of the obligation to pay the difference between the 'Value of the Vehicle' and the amount owed on the financing contract," which Plaintiffs presumably believe will be less than the remaining loan balance in the event of total loss. (*Id.*). Plaintiffs assert that if they "had purchased and financed a true 'debt cancellation agreement' as defined by Maryland's credit statutes . . . Plaintiffs would not have had any obligation to make any payments toward the remaining loan balance on their vehicle loan for the [vehicle] after a total loss or theft, after the application of the insurance proceeds." (ECF No. 1 ¶ 41). Plaintiffs aver that "because the GAP agreement is not a true debt cancellation agreement, it does not relieve them of that potential obligation – but they [were] still required to pay $750 for [the GAP Agreement]." (*Id.*).

Although Plaintiffs did not actually suffer any loss on their used Mercedes-Benz (thus the allegedly "phony" debt cancellation agreement was not applied in their case), they contend that "Maryland law does not permit the financing of the phony GAP Agreements in question – or the charging or collection of charges for such phony GAP Agreements – it only permits creditors to finance and charge and collect for true debt cancellations agreements which cancel the outstanding debt remaining on an account." (*Id.* ¶ 43). Plaintiffs allege that

4

eleven dealerships associated with one another under the non-incorporated Pohanka Automotive Group umbrella in order to advertise as one entity. (*Id.* ¶ 8). Plaintiffs contend that the entities that are part of the Pohanka Automotive Group aided and abetted one another and conspired regularly to sell and finance, and regularly sold and financed, "the form GAP Agreements which did not constitute true debt cancellation agreements eligible for financing under Maryland's credit statutes." (*Id.* ¶ 47). According to the complaint, the Pohanka Automotive Group agreed to assign credit contracts financing the GAP Agreements to SunTrust Bank. (*Id.* ¶ 48). Plaintiffs assert that Pohanka Isuzu is a name under which the Pohanka Defendants associate "in order to conduct their conspiracy." (*Id.* ¶ 51).

The complaint identifies multiple transactions in which "the Pohanka Automotive Group and its co-conspirators financed phony GAP Agreements in a similar manner" to Plaintiffs' transaction. (ECF No. 1, at 17-21). Plaintiffs aver that "[t]he Pohanka Automotive Group repeatedly undertook similar actions in the course of their conspiracy. Each and every Pohanka Defendant took part in the sale and financing of GAP Agreements to Class members in violation of CLEC, and directly sold illegal GAP Agreements to Class members in numerous similar transactions." (ECF No. 1 ¶ 56). The complaint avers that the Pohanka Automotive Group and SunTrust Bank have conspired to

collect and have collected from Named Plaintiffs and class members interest, costs, fees, and other charges which Plaintiffs maintain are uncollectible "and must be forfeited on each credit contract due to the financing of the phony GAP Agreements." (*Id.* ¶ 58).

### B. Procedural Background

Plaintiffs filed a putative class action complaint on October 31, 2013 against the eleven Defendants identified above and SunTrust Bank. (ECF No. 1). The complaint alleges four counts including: (Count I) violations of CLEC; (Count II) breach of contract; and (Count IV) restitution and unjust enrichment. Plaintiffs also seek declaratory and injunctive relief (count III). On January 9, 2014, SunTrust filed a motion to dismiss or to strike class allegations. (ECF No. 18). Plaintiffs subsequently accepted Rule 68 offer of judgment from SunTrust Bank and the undersigned issued an order on February 26, 2014 entering judgment for Plaintiffs on the terms set forth in the Rule 68 Offer of Judgment dated February 10, 2014. (ECF No. 23). On March 13, 2014, an order was entered certifying as final the judgment entered on February 26, 2014 as to all claims of Plaintiffs against Defendant SunTrust Bank. (ECF No. 26).[2]

---

[2] The accepted Rule 68 offer of judgment moots the motion to dismiss or to strike class allegations filed by SunTrust Bank. (ECF No. 18).

The eleven remaining Defendants also moved to dismiss on January 9, 2014. (ECF No. 17). Plaintiffs opposed the motion (ECF No. 24), and Defendants replied (ECF No. 30).

## II. Standard of Review

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). A plaintiff's complaint need only satisfy the standard of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

At this stage, all well-pleaded allegations in a complaint must be considered as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and all factual allegations must be construed in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (*citing Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). In evaluating the complaint, unsupported legal

allegations need not be accepted. *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989). Legal conclusions couched as factual allegations are insufficient, *Iqbal*, 556 U.S. at 678, as are conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

## III. Analysis

### A.   Standing

Defendants challenge Plaintiffs' standing to bring claims against the dealership defendants with whom Plaintiffs did not transact. Specifically, Plaintiffs entered into their financing contract with a single dealership, Pohanka Isuzu, operated by Pohanka Auto North at the time. (*See* ECF No. 1-2). The Pohanka Defendants[3] argue that Plaintiffs lack standing to assert any claims against them. (ECF No. 17-1, at 39). Thus, even assuming Plaintiffs suffered an injury arising from the financing of a "phony" debt cancellation agreement, Pohanka Defendants maintain that it cannot be attributed to them because they were not in contractual privity with the Joneses (thus they were not "credit grantors" *as to Plaintiffs' transaction* under CLEC).

---

[3] The Defendants other than Pohanka Auto North, Inc. will be referred to as "Pohanka Defendants."

Article III standing is a threshold jurisdictional requirement. *See Central Wesleyan College v. W.R. Grace & Co.*, 6 F.3d 177, 188 (4th Cir. 1993) ("standing is a jurisdictional issue, and courts should attempt to resolve such issues as soon as possible."). The Supreme Court has consistently required that a litigant have "standing" to challenge the action sought to be adjudicated in federal court. *Valley Forge*, 454 U.S. at 471. "In order to have standing, a plaintiff must demonstrate some actual or threatened injury as a result of the putatively illegal conduct of the named defendant, and must show that the injury can be fairly traced to the challenged action and that the injury is likely to be redressed by a favorable decision." *Herlihy v. Ply-Gem Industries, Inc.*, 752 F.Supp. 1282, 1290 (D.Md. 1990); *see also Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91 (1979). "The constitutional limits on standing result in the elimination of a claim in which the plaintiff has failed to make out a case or controversy between himself and the named defendant." *Herlihy*, 752 F.Supp. at 1290. As the Supreme Court of the United States noted:

> That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class "must allege and show that they personally have been injured, not that injury has been suffered by other unidentified members of the class to which they belong and which they purport to represent."

*Lewis v. Casey*, 518 U.S. 343, 357 (1996) (alteration in original) (*quoting Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976)).  The United States Court of Appeals for the Fourth Circuit has echoed this outlook, stating that in the class action context, "it is essential that named class representatives demonstrate standing through a 'requisite case or controversy between themselves personally and [each defendant]." *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 188 (4th Cir. 1993) (emphasis added); *Lieberson v. Johnson & Johnson Consumer Co., Inc.*, 865 F.Supp.2d 529, 537 (D.N.J. 2011) (holding that the plaintiff lacked standing to pursue putative class action claims of consumer fraud against a baby bath product manufacturer as to any products the named plaintiff did not allege she used or purchased).

Plaintiffs assert that they have standing over Pohanka Defendants based on each Defendant having aided and abetted one another and conspired to finance vehicle sales using "phony" debt cancellation agreements that violated Maryland law.  With respect to aiding and abetting, the complaint asserts that each Pohanka Defendant aided and abetted one another in selling and financing "the illegal GAP Agreement . . . and knowingly provided substantial assistance, aid, and encouragement in the commission of that conduct by providing forms to the other dealerships for the sale of the illegal GAP Agreements, by

agreeing on and encouraging the other dealerships to sell and finance the illegal GAP Agreements." (ECF No. 1 ¶ 80).

Pohanka Defendants assert that to the extent Plaintiffs attempt to hold them liable through aiding and abetting allegations, "their effort fails as a matter of statutory interpretation." (ECF No. 17-1, at 41).   They argue that "[b]ecause the CLEC is silent as to aiding and abetting or other derivative liability, this Court may not read into that statute a cause of action against the Non-Seller Pohanka Defendants." (ECF No. 17-1, at 41).   Plaintiffs counter that unlike cases that have declined to uphold claims for aiding and abetting where the statute did not explicitly provide for such liability, CLEC includes a broad definition of "credit grantor." (ECF No. 24, at 50).   Section 12-1001(g)(1) defines a "credit grantor" as:

> any individual, corporation, business trust, statutory trust, estate, trust, partnership, association, two or more persons having a joint or common interest, or any other legal or commercial entity making a loan or other extension of credit under this subtitle . . . or is a retailer.

Md. Code Ann., Com. Law § 12-1001(g)(1).   Plaintiffs argue that "the statutory text contemplates broad regulation of credit grantor 'association[s]' like Pohanka," thus making them liable as aiders and abettors.   (ECF No. 24, at 50 n.24).

11

Plaintiffs' arguments are unavailing.   Although Maryland
law recognizes aider and abettor civil liability for those who
"actively participate . . . in the commission of a tort,"
*Alleco, Inc. v. Harry & Jeannette Weinberg Found.*, 340 Md. 176,
200 (1995), "Maryland courts have not yet extended the scope of
aiding and abetting liability or assignee liability to statutes
providing for civil liability where the statute does not
expressly impose this additional avenue of liability," *Petry v.
Wells Fargo Bank, N.A.*, 597 F.Supp.2d 558, 565 (D.Md. 2009).
"[C]ivil aiding and abetting liability is determined on a
statute-by-statute basis." *Baltimore-Washington Tel. Co. v. Hot
Leads Co., LLC*, 584 F.Supp.2d 736, 745 (D.Md. 2008) (*citing
Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver,
N.A.*, 511 U.S. 164, 181-82 (1994)).   The legislature "[knows]
how to impose aiding and abetting liability when it [chooses] to
do so." *Cent. Bank of Denver*, 511 U.S. at 176.   In this case,
the statutory language of CLEC does *not* specifically provide for
such liability.   *See, e.g., Petry*, 597 F.Supp.2d at 565
(declining to extend aiding and abetting liability under the
Finder's Fee Act and the Maryland Consumer Protection Act).   The
broad definition of "credit grantor" under CLEC does not qualify
as an express imposition of aiding and abetting liability for
violations thereof.   *See Baltimore-Washington Tel. Co.*, 584
F.Supp.2d at 746 (refusing to expand liability under federal

statute for aiding and abetting where statute did not expressly
provide for such liability).

Plaintiffs also premise their claims against Pohanka
Defendants on the theory that they conspired to finance "phony"
debt cancellation agreements in contravention of CLEC and charge
interest and fees in connection therewith.  Specifically,
Plaintiffs contend that "Defendants developed and agreed to
implement a fraudulent scheme and conspiracy through the Pohanka
Automotive Group to market, sell and finance GAP Agreements . .
. with misleading and fraudulent representations and omissions
concerning the nature of the GAP Agreements." (ECF No. 1 ¶ 9).
Plaintiffs aver that in their transaction:

> the other Pohanka Defendants all conspired
> in the sale of the phony GAP Agreement. For
> example, the Buyer's Order for this
> transaction, which includes the $750 GAP
> charge, specifically lists Pohanka Hyundai,
> Pohanka Isuzu, Pohanka Imports, Pohanka
> Honda, Saturn of Bowie, Saturn of Marlow
> Heights, Saturn of Waldorf, and Pohanka Used
> Cars on these transaction documents.

(*Id.* ¶ 49).[4]

"In a multi-defendant action or class action, the named
plaintiffs must establish that they have been harmed by each of

---

[4] Plaintiffs refer to the "Buyer's Order" as listing other
dealerships, but have not supplied a copy of such a document.
The RISC and debt cancellation agreement included as exhibits to
the complaint identify *only* Pohanka Isuzu as the seller. *Veney
v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (a court need not
accept as true "allegations that contradict matters properly
subject to judicial notice or by exhibit.").

the defendants" and they may not use the procedural device of a class action "to bootstrap themselves into standing they lack." *Crowder v. Master Financial*, 176 Md. App. 631, 646 (2007).  In a situation where a named plaintiff did not deal directly with the named defendants, "a plaintiff may be able to satisfy the injury aspect of standing through sufficient allegations of conspiracy." *See Cent. Wesleyan Coll.*, 6 F.3d at 188 ("[w]hile allegations of conspiracy among parties with whom a plaintiff did not directly deal may confer standing upon the plaintiff to sue the nondealing parties,[] the Supreme Court has emphasized that indirectness of injury, though not fatal to standing, 'may make it substantially more difficult to meet the minimum requirement of Art. III,' *Warth v. Seldin*, 422 U.S. 490, 505 (1975)."); *Brown v. Cameron-Brown Co.*, 652 F.2d 375, 378 (4th Cir. 1981) ("[w]e are in full accord with the district court that when plaintiffs alleged injury as a result of a conspiracy in which the non-dealing defendants participated, plaintiffs have alleged standing to sue the non-dealing defendants.").

Under Maryland law, civil conspiracy is defined as the "combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff." *Hoffman v. Stamper*, 385

14

Md. 1, 24 (2005).   In addition to proving an agreement, "[t]he plaintiff must also prove the commission of an overt act, in furtherance of the agreement, that caused the plaintiff to suffer actual injury." *Id*. at 25.   In *Shenker v. Laureate Education, Inc.*, 411 Md. 317, 352 (2009), the Court of Appeals of Maryland held that a defendant may not be held liable for civil conspiracy "where that defendant is legally incapable of committing the underlying tort."   Because one of the defendants owed no fiduciary duty to the plaintiffs, the court held that this defendant could not be held liable for conspiracy to breach a fiduciary duty and affirmed the dismissal of the conspiracy claim against the defendant. *Id*.   In dismissing the civil conspiracy claim, the *Shenker* court explained:

> [T]ort liability arising from a conspiracy presupposes that the coconspirator is legally capable of committing a tort, that is, that [the co-conspirator] owes a duty to the plaintiff recognized by law and is potentially subject to liability for breach of that duty." . . . "[A] cause of action for civil conspiracy may therefore not arise if the alleged conspirator, though allegedly a participant in the agreement underlying the injury, was not personally bound by the duty violated by the wrongdoing.

*Id*. at 352 (*quoting Bahari v. Countrywide Home Loans*, No. 05-2085, 2005 WL 3505604, at *6 (D.Md. Dec. 16, 2005)); *BEP, Inc. v. Atkinson*, 174 F.Supp.2d 400, 409 (D.Md. 2001)).   Thus, civil conspiracy requires an agreement, and an overt act in

15

furtherance of the agreed-to unlawful conduct that causes injury, as well as the legal capacity of the conspirators to complete the unlawful conduct.

Pohanka Defendants argue that they cannot be liable on the basis of civil conspiracy because they were not legally capable of committing the underlying violations. (ECF No. 17-1, at 41-42). Pohanka Defendants assert that "only Auto North and SunTrust were in privity with the Joneses and could have breached any contractual obligation to them." (ECF No. 17-1, at 43). Moreover, Pohanka Defendants point out that CLEC applies only to credit grantors and no entities other than Pohanka Auto North and SunTrust Bank acted as a credit grantor in *Plaintiffs' transaction*. Plaintiffs disagree, taking the position that Pohanka Defendants are all credit grantors within the meaning of CLEC, thus legally capable of violating the statute. They contend that because CLEC regulates each Pohanka Defendant, they are legally capable of committing the underlying alleged violations. Plaintiffs maintain that the complaint "asserts that each Pohanka entity did, in fact, owe direct duties under CLEC to Plaintiffs and putative class members with whom they had direct dealings – and that in each such transaction with putative class members, and as part of their overarching conspiracy, they each directly violated CLEC. . . . Each Pohanka entity owed a direct duty under CLEC to putative class members,

a direct duty each Pohanka entity breached." (ECF No. 24, at 56).

The relevant inquiry is whether Pohanka Defendants are legally capable of violating CLEC in *Plaintiffs'* transaction, not in some other transaction they may have entered into with putative class members where each Pohanka Defendant functioned as a credit grantor. *See, e.g., Pashby v. Delia*, 709 F.3d 307, 316 (4th Cir. 2013) ("When the case is a class action lawsuit, the named class representatives 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong.'" (*quoting Blum v. Yaretsy*, 457 U.S. 991, 1001 n.13 (1982))). Thus, the argument that Pohanka Defendants financed GAP Agreements sold to putative class members and are thus legally capable of committing the underlying statutory violation misses the mark, as Plaintiffs must establish *their* standing to sue Pohanka Defendants. Indeed, this same argument was rejected in *Minter v. Wells Fargo Bank, N.A.*, 924 F.Supp.2d 627, 647-48 (D.Md. 2013). In that case, plaintiffs argued (unsuccessfully) that it did not matter that two of the defendants "are not alleged to have [acted as mortgage brokers] in the transactions in this case" as long as "they *could* have" in some transaction. *Id.* at 647 (emphasis in original). The court held that the fact that defendants are "hypothetically capable of functioning as

17

mortgage brokers in some other context, does not render them capable of committing the tort that is underlying the conspiracy claims." *Id.* at 648; *see also Lombel v. Flagstar Bank F.S.B.*, No. PWG-13-704, 2013 WL 5604543, at *4 n.5 (D.Md. Oct. 11, 2013) ("The decisive fact is that Defendant was not a mortgage broker in this transaction; there is no need to consider whether facts could ever arise that could render Defendant liable under the FFA."). Similarly, the fact that Pohanka Defendants may be regulated by CLEC as credit grantors in other lending transactions does not establish that they are legally capable of violating the statute as to *Plaintiffs*.

Plaintiffs also argue that the "entire Pohanka Automotive Group has the status of credit grantor in Plaintiffs' transaction under CLEC." (ECF No. 24, at 49). Plaintiffs state for the first time in their opposition that Pohanka Defendants are retailers, which is included in the definition of "credit grantor" under Section 12-1001(g). (ECF No. 24, at 49-50). This allegation is nowhere in their complaint, however. They also argue that the Pohanka Automotive Group qualifies as an "association," which also is included in the definition of "credit grantor" under CLEC. Plaintiffs believe that Pohanka Defendants' alleged "association" or "retailer" status makes them credit grantors in *Plaintiffs'* transaction. There are several problems with Plaintiffs' arguments. First, Plaintiffs'

reliance on the definition of "credit grantor" is misplaced. Specifically, "credit grantor" is defined as "any . . . association . . . *making a loan or other extension of credit under this subtitle which is incorporated*, chartered, or licensed pursuant to State or federal law, the lending operations of which are subject to supervision, examination, and regulation by a State or federal agency or which is licensed under Title 12, Subtitle 4 of the Financial Institutions Article or is a retailer." Md. Code Ann., Com. Law § 12-1001(g)(1) (emphasis added). Notably, the complaint refers to Pohanka Defendants as "The Pohanka Automotive Group," but alleges that this group is comprised of entities associated with one another under the *non-incorporated* Pohanka Automotive Group umbrella. (ECF No. 1 ¶ 8). As Pohanka Defendants point out, "[t]here is nothing to suggest that the legislature used the word 'association' to create derivative liability of one legal entity for a credit transaction entered into by another." (ECF No. 30, at 24).

Second, *Plaintiffs'* actual contract documents identify Pohanka Isuzu as the only Creditor-Seller. "That is the sole entity that extended the credit and elected CLEC." (ECF No. 30, at 24). As Pohanka Defendants point out, "the fact that affiliate companies may advertise together or share order forms does not, [] create derivative liability or make one affiliate

the credit grantor on a contract made by another affiliate."
(ECF No. 30, at 24). Only Pohanka Isuzu entered into a credit
contract and a debt cancellation agreement with Plaintiffs (with
SunTrust Bank as the lienholder). The fact that other
dealerships engaged in a uniform practice of financing debt
cancellation agreements that Plaintiffs allege did not comply
with the statutory definition is insufficient to show that
Pohanka Defendants were legally capable of committing the
underlying contractual and statutory violations as to
Plaintiffs.

Even assuming Plaintiffs could show that Pohanka Defendants
were legally capable of committing the underlying violations as
to them, the allegations are insufficient to plead a conspiracy
among all Defendants. Detrimental to Plaintiffs' conspiracy
allegations here is the requirement that "plaintiff must set
forth more than just conclusory allegations of [the] agreement."
*Brady v. Livingood*, 260 F.Supp.2d 94, 104 (D.D.C. 2004). The
complaint should include factual allegations that provide an
indication of when and how the agreement was brokered and how
each of the defendants specifically were parties to the
agreement. *Day v. DB Capital Grp., LLC*, Civ. Action No. DKC 10-
1658, at *6 (D.Md. Mar. 11, 2011); *Acosta Orellana v. CropLife
Int'l*, 711 F.Supp.2d 81, 113-14 (D.D.C. 2011). The complaint
merely alleges that "[t]he Defendants conspired among

themselves, by agreement and understanding, to engage in the acts which resulted in legal damages to Named Plaintiffs and the Class they represent." (ECF No. 1 ¶ 6). The complaint further states that "the Defendants developed and agreed to implement a fraudulent scheme and conspiracy through the Pohanka Automotive Group to market, sell and finance GAP Agreements in a uniform way." (*Id.* ¶ 9). These allegations do not support a true conspiracy, but rather concerted action. *Cf. DB Capital Grp.*, 2011 WL 887544, at *7 (finding conspiracy allegations sufficient where plaintiff's complaint referenced specific instances when alleged co-conspirators met, and engaged in acts to defraud plaintiff).

The analysis in *Herlihy*, 752 F.Supp. at 1290, is instructive. That case involved a putative class action by a group of homeowners against manufacturers of fire retardant plywood products, alleging that the products were defective. The court reasoned:

> Nowhere in the complaint is there an allegation that a named plaintiff suffered any injury or damage because of the wrongful act or conduct of a named defendant. Rather than relying on any allegation in the complaint of a specific injury [caused by a named defendant], plaintiffs contend that they have standing to sue under a so-called "concert of action" theory. Plaintiffs argue that a defendant may be liable for an injury caused by the product of another if the plaintiff can prove that multiple defendants acted tortuously pursuant to a

21

> common plan or design. [] Plaintiffs
> contend that they have sufficiently alleged
> in this case a concert of action and that
> therefore they have standing to sue the six
> named defendants.

*Id.* The court rejected this argument, noting that Maryland law does not recognize a cause of action based upon an alleged concert of action. Here, although Plaintiffs use the word "conspiracy" in the complaint, the factual allegations support, at most, the inference of concerted action among Pohanka Defendants, which does not confer standing.[5]

Based on the foregoing, there is no standing over Pohanka Defendants (other than Pohanka Auto North) and all counts against them will be dismissed.

**B.   CLEC**

In Count I of the complaint, Plaintiffs allege that Pohanka Auto North violated CLEC, Md. Code Ann., Com. Law § 12-1005, by charging and collecting from Plaintiffs and members of the class "impermissible charges for the phony GAP Agreements – charges which are not permitted to be financed under CLEC." (ECF No. 1 ¶ 75). The CLEC claim is premised on the allegation that the debt cancellation agreement which they entered into was not a

---

[5] For instance, in *Acosta*, 711 F.Supp.2d at 114, the court dismissed a civil conspiracy claim because the plaintiff failed to provide any factual support that the defendant CropLife had an agreement with the other defendants and found that it was just as likely that they were acting independently with a common motivation or goal.

"true" debt cancellation agreement because it was inconsistent with the statutory definition of a debt cancellation agreement. Specifically, under CLEC, a debt cancellation agreement "requires a lender to cancel the remaining loan balance when a car is totaled and insurance payout does not cover the entire outstanding balance." *Decohen v. Capital One, N.A.*, 703 F.3d 216, 219 (4th Cir. 2012). At the time Plaintiffs executed the debt cancellation agreement – in August 2008 – Section 12-1001(h) defined a debt cancellation agreement as:

> an agreement between a credit grantor and a borrower which provides for cancellation of the remaining loan balance in the event of theft or total destruction of the collateral for the loan after application of the proceeds of any insurance maintained on the collateral for the loan.

Md. Code Ann., Com. Law. § 12-1001(h) (effective to May 31, 2010). Plaintiffs assert that the debt cancellation agreement that was part of their contract did not comply with Maryland law because it did not require cancellation of the remaining loan balance, instead requiring the cancellation of the difference between the remaining loan balance and the "value of the vehicle," as determined by the greater of the casualty insurer's determination or the book value of the vehicle at the time of the loss or destruction. (ECF No. 1-3, at 1). Plaintiffs assert that because the debt cancellation agreement did not

comply with CLEC, it could not be financed, and they should not have incurred any charges in connection therewith.

The remaining Defendant argues that Plaintiffs have not stated a claim because: (1) the contract incorporated CLEC's definition of a debt cancellation agreement, thus it would have been enforced in accordance with the statute; and (2) Plaintiffs have "never suffered a loss of their vehicle or made any GAP claim, much less had a claim that was handled inconsistently with the statutory debt cancellation agreement description." (ECF No. 17-1, at 17). Defendant maintains that "[w]here, as here, the [P]laintiffs have never suffered a loss or made a request for debt cancellation, there is no CLEC violation unless and until a defendant fails to honor such a request in accordance with the statute." (*Id.* at 14). Plaintiffs take the position that "a debt cancellation agreement may be financed under CLEC only if, at the time of origination, it 'provides for' the lender to cancel the remaining debt. . . . The violation of CLEC is committed, and determinable, at origination." (ECF No. 24, at 25). They assert that "[b]ecause the [] credit contract violated CLEC, [] no interest, costs, fees, or other charges could be collected with respect to it. . . . Accordingly, at the time Pohanka originated Plaintiffs' contract and financed the phony GAP Agreement – which undisputably did not 'provide for' the cancellation of the

remaining loan balance in violation of CLEC – Plaintiffs were entitled to a loan free of interest, costs, and charges (including the charge for their GAP Agreement)." (ECF No. 24, at 22).

CLEC provides that "[i]n connection with closed end credit offered and extended . . . a credit grantor may charge and collect the interest and other charges permitted by this subtitle." Md. Code Ann., Com. Law § 12-1002(b). "Other charges permitted" include "[t]he cost to the borrower of an optional debt cancellation agreement, provided that the cost of the debt cancellation agreement is separately itemized in the financing agreement." *Id.* § 12-1005(c)(1). As Defendant points out – and Plaintiffs do not dispute – CLEC was incorporated into the parties' credit contract. Specifically, the credit contract stated that "[t]his contract shall be subject to the Credit Grantor Closed End Credit Provisions (Subtitle 10) of Title 12 of the Commercial Law Article of the Maryland Code." (ECF No. 1-2, at 4). Thus, the credit contract incorporated the terms and requirements of CLEC. *See, e.g., Decohen*, 703 F.3d at 229 ("Decohen's credit contract, in which the parties elected to be governed by the CLEC, thus incorporated the terms of the CLEC to govern the attached debt cancellation agreement."); *Patton v. Wells Fargo Financial Maryland, Inc.*, 437 Md. 83, 114 (2014) ("Wells Fargo Financial voluntarily chose to take assignment of

25

a loan contract that incorporated CLEC . . . In accepting the assignment, Wells Fargo Financial expressly agreed to be governed by CLEC in the exercise of its rights under the contract."). It is undisputed that Defendant has not enforced any conflicting provision as to Plaintiffs, to the extent that the debt cancellation agreement conflicted with CLEC. Plaintiffs have suffered no loss of their vehicle (*e.g,* no theft or total destruction of the collateral securing the loan) and cannot allege any failure by Defendant to honor the debt cancellation agreement in accordance with CLEC *as to Plaintiffs*.

Plaintiffs rely on *Decohen* and *Patton* for the proposition that a credit grantor violates CLEC "by financing a GAP Agreement which permits the credit grantor to determine the remaining loan balance to be cancelled by reference to a NADA valuation guide." (ECF No. 24, at 20). In *Decohen*, 703 F.3d 216, the borrower financed the purchase of a used car under a loan contract that also incorporated CLEC in terms nearly identical to those of the credit contract here. The loan contract also financed a debt cancellation agreement. The car dealer assigned the loan contract to a bank. Unlike this case, however, plaintiff's car was totaled, but Capital One refused to wipe out the existing loan balance in violation of CLEC. Plaintiff in *Decohen* filed a class action lawsuit against Capital One, the assignee bank, Beacon Industries Worldwide, the

servicer of the debt cancellation agreement, and Abassi LLC. Judge Quarles dismissed the CLEC claim on the basis that it was preempted by the National Bank Act (NBA), and this portion of his opinion was later reversed by the Fourth Circuit. *See Decohen*, 703 F.3d at 225. Plaintiffs find persuasive, however, a portion of Judge Quarles's opinion which was not appealed, in which he declined to dismiss the CLEC claim for failure to state a claim. *See Decohen v. Abbasi, LLC*, Civ. No. WDQ-10-3157, 2011 WL 3438625, at *3-4 (D.Md. July 26, 2011). Specifically, Judge Quarles applied the following rationale in concluding that "[t]he CLEC claim will not be dismissed on the basis that Decohen's allegations fail to state a basis for relief under Maryland law":

> The definition of "debt cancellation agreement" does not provide that a creditor may apply a retail guide value to calculate the amount of debt cancelled. Instead, it only provides that such an agreement cancels the remaining loan balance less "the proceeds of any insurance." Md. Code. Ann., Comm. L. § 12-1001(h). Further, none of the items that may be excluded from "remaining loan balance" allow the creditor to deduct the difference between the insurance payout and the car's retail value. Accordingly, Decohen's complaint is sufficient to show that the GAP Agreement is not a "debt cancellation agreement" within the meaning of the CLEC, and therefore may not be financed "in connection with closed end credit offered and extended" under the statute. Md. Code. Ann., Comm. L. § 1002(b).

*Id.* at *4.

The facts of *Decohen*, however, are readily distinguishable. Although Judge Quarles declined to dismiss the CLEC claim where the debt cancellation agreement conflicted with CLEC - which also was incorporated into the parties' credit contract - in that case, the conflicting provision was actually applied to plaintiff.  In other words, in *Decohen*, Capital One demanded payment of the remaining loan balance in violation of CLEC.  The Fourth Circuit noted that "[u]nder Maryland law, [] the holder of the note on the vehicle would have been compelled to cancel the remaining balance."  *Id.* at 220.  Here, there was no such refusal to cancel the outstanding loan balance in violation of CLEC; in fact, there was no theft or total destruction of property even to trigger the terms of the debt cancellation agreement.[6]

Moreover, CLEC was incorporated into the contract, thus to the extent certain terms of the debt cancellation agreement entered into by Plaintiffs conflicted with CLEC, CLEC governed the contractual relationship.  As held by the Court of Appeals

---

[6] The parties in *Decohen* eventually entered into a settlement agreement, which Judge Quarles approved.  *See Decohen v. Abbasi, LLC*, --- F.R.D. ----, 2014 WL 1603735, at *3 (D.Md. Apr. 17, 2014).  Notably, the settlement agreement defined the settlement class as "borrowers in up to 2,027 transactions who financed GAP Agreements which allow for the use of retail car guides in the calculation of the vehicle's value, *where the borrowers suffered a total loss of the vehicle*."  (emphasis added).

of Maryland, "a contract provision that violates public policy set forth in a statute is invalid to the extent of the conflict between the contract and that policy." *John Deere Const. & Forestry Co. v. Reliable Tractor, Inc.*, 406 Md. 139, 153 (2008). In *John Deere*, the contractual provision conflicted with the statutory provision. The court held that "the provisions of the contracts at issue in this case that allow termination without good cause are invalid to the extent that they conflict with the good cause provision set forth in § 19-103." *Id.; Ins. Comm'r v. Metro. Life Ins. Co.*, 296 Md. 334, 340 n.6 (1983) ("clauses in insurance policies, which are inconsistent with statutes mandating certain coverages, are void to the extent of the inconsistency."). Thus, the inconsistency between terms in the debt cancellation agreement and the statutory definition of CLEC at the time (in August 2008) invalidates the inconsistent provision. But as explained above, in this case, the inconsistent provision was never triggered (thus, Defendant never had occassion to enforce it).

Plaintiffs' reliance on *Patton*, 437 Md. 83, is similarly misplaced. First, *Patton* involved the repossession provisions of CLEC, not a debt cancellation agreement. Second, the CLEC violation alleged in *Patton* was the creditor's failure to *perform* in accordance with CLEC, not its failure to set forth the applicable terms of CLEC in the RISC. Moreover, the

specific issue addressed in *Patton* concerned the applicable statute of limitations for claims under CLEC, which is no longer at issue as Defendant has withdrawn all arguments regarding statute of limitations. (ECF No. 30, at 31 ("Pohanka hereby withdraws its argument to dismiss the [c]omplaint based on the statute of limitations")). Thus, Plaintiffs mischaracterize *Patton* as holding that "the failure of a GAP Contract to 'provide for' cancellation of the remaining loan balance is a violation of CLEC." (ECF No. 24, at 24).[7] Plaintiffs insist that a "violation of CLEC is committed, and determinable, at origination" of the loan contract, but this principle is not supported by any factually analogous cases involving CLEC claims premised on the inclusion of a debt cancellation agreement that does not conform to the statutory definition but is not actually enforced.

Plaintiffs next argue that the legislative history of CLEC supports their position that a debt cancellation agreement that

---

[7] Plaintiffs also misconstrue Defendant's argument as suggesting that "*Decohen* should be read as immunizing credit grantors from violations of CLEC by magically changing the terms of written agreements to conform with the law." (ECF No. 24, at 24). That is not what Defendant argues. Defendant argues – quite persuasively – that "when there is an actual or potential incompatibility between a stated term of a contract and incorporated statutory provisions, the contractual terms are interpreted as a matter of law [] to be consistent with the statutory provisions" and liability may be premised on *enforcement* of an inconsistent contractual provision. (ECF No. 30, at 9).

is contrary to the statutory definition cannot be financed.  The problem is that Plaintiffs discuss the legislative history of a *different* statute, the Retail Installment Sales Act ("RISA"), Md. Code Ann., Com. Law II, § 12-601, *et seq.*  Plaintiffs argue that "[t]he Maryland Court of Appeals specifically noted that RISA, the predecessor to CLEC, is designed to remedy the situation where the buyer probably is discouraged from reading the contract and might not fully understand its terms even if he did read it." (ECF No. 24, at 27) (internal citations omitted).  Plaintiffs appear to argue that some consumers may not appreciate their rights under CLEC when a contract includes terms inconsistent with a statute expressly incorporated into the contract.  Plaintiffs conveniently ignore that in the very same case they cite, the Court of Appeals of Maryland noted that "CLEC clearly is intended to be construed independently from RISA." *Ford Motor Credit Co., LLC v. Roberson*, 420 Md. 649, 667 (2011).  "RISA governs extensions of credit that are *not* made pursuant to CLEC." *Epps v. JPMorgan Chase Bank N.A.*, Civ. Action No. WMN-10-1504, 2012 WL 5250538, at *3 (D.Md. Oct. 22, 2012) (emphasis added).

Indeed, RISA expressly prohibits certain contract provisions. *See* Md. Code Ann. Com. Law II, § 12-607.  Section 12-630(d) explicitly states that "[i]f an instrument contains any provision prohibited by § 12-607 of this subtitle, that

provision is void and the holder may not collect or receive from the buyer, in connection with the transaction to which the instrument relates, any finance, delinquency, or collection charge." There is no provision in CLEC that prohibits financing of a debt cancellation agreement that contains conflicting terms with the statutory definition. The subsection concerning prohibited clauses in "[a]n agreement, note, or other evidence of a loan" is found in Section 12-1023 of CLEC. Although Plaintiffs maintain that Section 1023 "has no application here," that subsection is quite instructive. (ECF No. 24, at 32 n.10). Specifically, Section 12-1023(b)(3) states that "[e]xcept as expressly allowed by law, an agreement, note, or other evidence of a loan may not contain a provision by which the borrower waives any right accruing to the borrower under this subtitle [CLEC]."[8] Section 12-1023(b)(4)(i) states that "[a]ny clause or provision in agreement, note, or other evidence of a loan that is in violation of this subsection shall be unenforceable." Furthermore, Section 12-1018(a)(2) contains a general "civil

---

[8] Plaintiffs assert that "[a]s this Court held in *Decohen*, a creditor violates a different section of CLEC – § 12-1001 – by financing a phony GAP Agreement." (ECF No. 24, at 32 n.10). First, Section 12-1001 is a "definitions" section; Section 12-1001(h) defines a debt cancellation agreement. It does not contain any prohibition on financing of a debt cancellation agreement that is different from the statutory definition. Indeed, Section 12-1023 covers prohibited clauses in an agreement and the consequences associated with including prohibited clauses.

penalty" provision for *any* violation of CLEC.  Specifically,
Section 12-1018 states that "[e]xcept for a bona fide error of
computation, if a credit grantor violates any provision of this
subtitle the credit grantor may collect only the principal
amount of the loan and may not collect any interest, costs,
fees, or other charges with respect to the loan."  Notably,
Section 12-1023(b)(4)(ii) states that "the penalties set out
under §§ 12-1017 [criminal penalties] and 12-1018 [civil
penalties] of this subtitle *do not apply unless the credit
grantor attempts to enforce a provision prohibited under this
subsection [Section 12-1023]*."  (emphasis added).  Here,
Defendant did not attempt to enforce *any* provision of CLEC.

Plaintiffs argue that by issuing a debt cancellation
agreement that conflicts with the statutory definition under
CLEC, Defendant attempts to circumvent the statute's disclosure
requirement.  Plaintiffs assert:

> If it were the case that the law
> automatically re-wrote illegal contracts,
> and deficient disclosures, to comply with
> the law, there could never be an unlawful
> contract, nor could there ever be a case for
> disclosure violations.  Instead, perversely,
> creditors and others who failed to comply
> with disclosure requirements would be saved
> by the very laws that were intended to
> ensure that consumers were aware of their
> rights.  The Truth In Lending Act, the Fair
> Debt Collection Practices Act, and numerous
> other federal and state laws requiring
> disclosures and prohibiting the inclusion of
> illegal contract terms – with the penalty of

> statutory damages for non-compliance would
> be rendered essentially meaningless.

(ECF No. 24, at 30). Unfortunately for Plaintiffs, this case does not involve claims under TILA or the FDCPA. As the Fourth Circuit recently explained, unlike the Fair Debt Collection Practices Act, which provides for statutory damages as long as the claimant can establish a violation, 15 U.S.C. § 1692k(a)(2), "CLEC does not provide for any fixed statutory damages beyond the plaintiff's actual loss." *Bediako v. Am. Honda Fin. Corp.*, 537 F.App'x 183, 187 (4th Cir. Aug. 1, 2013) (Table opinion).

The analysis recently undertaken by Judge Bennett in *Askew v. HRFC, LLC*, Civ. Action No. RDB-12-3466, 2014 WL 1235922 (D.Md. Mar. 25, 2014), is instructive. That case arose out of a purchase of a used vehicle. The parties also entered into a credit contract (RISC) to finance the purchase, which, like here, was governed by CLEC. The plaintiff in *Askew* was charged an interest rate exceeding the Maryland statutory maximum for that specific type of loan under CLEC. The plaintiff argued that disclosing an interest rate that is higher than 24% creates a separate violation itself based on the following provision: "The rate of interest chargeable on a loan must be expressed in the agreement as a simple interest rate or rates." Md. Code Ann., Com. Law § 12-1003(a). Judge Bennett rejected this argument:

> The [p]laintiff has cited no case law to
> support the rather creative proposition that
> simply disclosing an improperly high
> interest rate is a separate violation from
> actually charging that interest rate.   The
> interest rate in the RISC was expressed as a
> simple interest rate, albeit higher than
> allowed by the CLEC.   *The only violation
> that has occurred in this case is the actual
> charging of an interest rate higher than
> 24%*.

*Askew*, 2014 WL 1235922, at *5 (emphasis added).   The same logic

applies here.   As Defendant points out, "the remedy under the

CLEC for inconsistent terms is unenforceability and there is no

civil penalty for unlawful contract terms that are not

enforced." (ECF No. 30, at 15).[9]

Based on the foregoing, the CLEC claim will be dismissed.

## C.   Breach of Contract

In Count II, Plaintiffs allege that Defendant is liable for

breach of contract because compliance with CLEC was made a part

of the RISC and Defendant breached the contract by violating

---

[9]   Plaintiffs also argue that certain arguments made by
Defendant in a memorandum in opposition to a motion for a
protective order filed in a *different* case that has settled,
*Holland v. Pohanka Auto North, Inc., et al.*, Case No. 8:12-cv-
02141 (D.Md.), support Plaintiffs' allegations here.   The only
specific example offered by Plaintiffs, however, is a prior
reference allegedly made by Defendants in the *Holland* litigation
to Section 12-1018(a)(2) & (3) as providing a penalty for
violations of CLEC, but noting that violations can be cured.
(ECF No. 24, at 33).   Plaintiffs take this to mean that "[t]o
invoke § 12-1018 is to admit there is a violation to cure."
(*Id.*).   This argument is a stretch and by no means constitutes a
judicial admission by Defendant.

CLEC.  To state a cause of action for breach of contract in Maryland, a plaintiff must allege that the defendant owed a contractual duty and that the defendant materially breached that duty.  *Taylor v. NationsBank, N.A.*, 365 Md. 166 (2001).  Because Plaintiffs have not asserted a CLEC violation, the breach of contract claim also fails.  The analysis in *Decohen*, 703 F.3d at 228-29, is instructive.  In *Decohen*, the Fourth Circuit found that the district court erred in dismissing the breach of contract claim, but on readily distinguishable facts.  In that case, as explained above, there was a total loss on the vehicle, yet Capital One refused to cancel the remaining loan balance in violation of Section 12-1001(h).  Indeed, the Fourth Circuit reasoned that "Capital One's *refusal to cancel Decohen's 'remaining loan balance'* would constitute a breach of that contract," which incorporated the terms of CLEC.  *Id.* at 229 (emphasis added).  Here, there was no such refusal because the debt cancellation agreement was never triggered to begin with.  Accordingly, this claim will be dismissed.

### D.   Restitution and Unjust Enrichment

In Count IV, Plaintiffs assert a claim for restitution and unjust enrichment based upon the same facts they allege in support of their CLEC claim.  (ECF No. 1, at 31-33).  In Maryland, to state a claim for unjust enrichment, a plaintiff must allege that: (1) a benefit conferred on the defendant; (2)

36

the defendant knew and appreciated the benefit; and (3) under the circumstances, the defendant's acceptance or retention of the benefit would be inequitable. *Mona v. Mona Elec. Group, Inc.*, 176 Md.App. 672 (2007).

The unjust enrichment claim premised on a CLEC violation fails because Plaintiffs have not alleged an actionable CLEC claim. Moreover, as Defendant points out, a contract exists here (the RISC) that covers the same subject matter as the unjust enrichment claim. Plaintiffs argue that they can plead in the alternative. Where a contract exists between the parties covering the same subject matter as the unjust enrichment claim, however, a plaintiff's claim for unjust enrichment *must* include an allegation of fraud or bad faith in the formation of the contract. *Kwang Dong Pharm. Co. v. Han*, 205 F.Supp.2d 489, 497 (D.Md. 2002); *Cnty. Com'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 100 (2000) ("Generally, courts are hesitant to deviate from the principle of the rule and allow unjust enrichment claims only when there is evidence of fraud or bad faith, there has been a breach of contract or a mutual rescission of the contract, when rescission is warranted, or when the express contract does not fully address a subject matter."). Although Plaintiffs state in the opposition to the motion to dismiss that they "plainly allege bad faith, alleging Defendant[] regularly sold and conspired to sell unlawful debt

37

cancellation agreements, with knowledge that they were unlawful," (ECF No. 24, at 35), nowhere in the complaint do Plaintiffs actually allege bad faith in the formation of the RISC.  Although the complaint includes general averments of fraud, Plaintiffs do not plead fraud with particularity required under Fed.R.Civ.P. 9(b).  Instead, the complaint includes conclusory allegations that "Defendants developed and agreed to implement a fraudulent scheme and conspiracy through the Pohanka Automotive Group to market, sell and finance GAP Agreement in a uniform manner . . . with misleading and fraudulent representations and omission concerning the nature of the GAP Agreement, and with the specific intent to deceive and defraud Named Plaintiffs and members of the Class."  (ECF No. 1 ¶ 9). Plaintiffs fail to delineate the fraudulent misrepresentation or omissions made in the formation of the contract.  *See, e.g., Epps*, 2012 WL 5250538, at *6 (dismissing unjust enrichment claim where the claim was premised on a violation of CLEC, which was incorporated into the written contract, and the necessary allegations of fraud or bad faith in the formation of the contract were missing).

Based on the foregoing, the unjust enrichment claim will be dismissed.

### E.   Declaratory or Injunctive Relief

Plaintiffs include as a separate count in the complaint a claim for declaratory and injunctive relief (Count III).  (ECF No. 1, at 29-31).  The complaint alleges that "Named Plaintiffs and members of the Class have received or will receive collection notices from one or more Defendants and/or creditors or debt collectors demanding payment of amounts including amounts attributable to the sale of phony GAP Agreement Plaintiffs assert[] could not be financed under CLEC[], and payment of interest, costs, fees and other charges in connection with the Credit Contracts of Plaintiffs and the Class, which are not collectible due to the financing of the phony GAP Agreements." (ECF No. 1 ¶ 93).  Plaintiffs seek a declaration that "Defendants may not collect any amounts attributable to phony debt cancellation agreements financed in the credit contracts signed by Plaintiffs and the Class, and may not collect any interest, fees, costs or other charges in connection with their Credit Contracts." (*Id.* ¶ 94).

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  The Fourth Circuit has explained:

39

> [I]t is elementary that a federal court may
> properly exercise jurisdiction in a
> declaratory judgment proceeding when three
> essentials are met: (1) the complaint
> alleges an actual controversy between the
> parties of sufficient immediacy and reality
> to warrant issuance of a declaratory
> judgment; (2) the court possesses an
> independent basis for the jurisdiction over
> the parties (e.g., federal question or
> diversity jurisdiction); and (3) the court
> does not abuse its discretion in its
> exercise of jurisdiction.

*Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 592 (4th Cir. 2004). Plaintiffs cannot meet the first prong because there is no actual controversy between *Plaintiffs* and Defendant of sufficient immediacy and reality to warrant issuance of a declaratory judgment. The accepted Rule 68 offer of judgment by SunTrust Bank included a waiver of the Joneses' loan balance and satisfaction of the loan, thus Plaintiffs cannot be pursued for any payments in connection with the credit contract. (*See* ECF No. 23). The RISC and debt cancellation agreement were terminated without the Joneses ever requiring any benefit conferred by the debt cancellation agreement. To the extent Plaintiffs seek a declaratory judgment based on claims of other potential class members in whose cases the debt cancellation agreement was triggered and Defendant failed to comply with the statutory definition, Plaintiffs' claim is *not* typical of the class. *See, e.g., Epps*, 2012 WL 5250538, at *9 n.8 ("A class that includes both individuals who have been

40

pursued for payments or judgments and those, like Epps, who have not, also fails to satisfy the commonality requirement of Rule 23(a)(2).).

Moreover, Defendant argues that Count III should be dismissed for the additional reason that Plaintiffs' finance contract and GAP Agreement were assigned to SunTrust; thus, Defendant is not the holder of the finance contract at issue here and does not seek to collect payment on those contracts. (ECF No. 17-1, at 45). Plaintiffs respond to this argument in a footnote in their opposition to the motion to dismiss, (ECF No. 24, at 47 n.18), citing a decision rendered by the Maryland Commissioner of Financial Regulation as holding that interest and costs collected in violation of a statute are not collectible only from an assignee (thus Defendant can be on the hook for prohibited costs). First, as Judge Motz pointed out in *Scott v. Nuvell Fin. Servs.*, Civ. Nos. JFM-09-3110, JFM-10-1094, 2013 WL 6909518, at *1 n.2 (D.Md. Dec. 31, 2013), this court is not bound by an administrative law decision. Second, that case involved application of a different statute, the Maryland Mortgage Lender Law, although the Commissioner interpreted a provision analogous to CLEC's Section 12-1018(a)(2). As summarized by Judge Motz:

> [The Commissioner] recognized the fundamental proposition that a lender is entitled to recover the principal amount of

41

> any loan it has made despite being
> prohibited from recovering interest, costs,
> fees, or other charges with respect to the
> loan.  The Commissioner held, however, that
> the lender was required to give the
> defendants a choice of either receiving a
> refund of the fees and interest already paid
> or having those fees and interest credited
> against the remaining principal.

*Nuvell Financial Services*, 2013 WL 6909518, at *1 n.2.  Here,

the actual lienholder is SunTrust Bank, thus it (and not

Defendant) would be assessing interest, costs, and fees.

Accordingly, the declaratory judgment claim fails for this

additional reason.  Plaintiffs' request for injunctive relief

has been mooted by the complete satisfaction of their loan

through the accepted Rule 68 offer of judgment.[10]

**IV.  Conclusion**

   For the foregoing reasons, the motion to dismiss will be

granted.  A separate order will follow.

_____/s/_____

DEBORAH K. CHASANOW
United States District Judge

---

[10] Additional arguments addressed in Defendants' motion to dismiss and reply brief regarding joinder of necessary parties need not be addressed considering the dismissal of Plaintiffs' claims on other grounds.